# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

## No. 26-1168
## (Consolidated with 26-1174)

HEATING, AIR CONDITIONING & REFRIGERATION DISTRIBUTORS INT'L, ET AL.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

## MOTION TO INTERVENE IN SUPPORT OF RESPONDENTS OF ALTA REFRIGERATION, INC. AND COALITION FOR THE USE OF SAFE AND EFFICIENT REFRIGERANTS

DAVID M. WILLIAMSON
WILLIAMSON LAW + POLICY, PLLC
1001 Connecticut Ave. NW, Suite 612
Washington, DC 20036
Tel.: (202) 256-6155
maxwilliamson@williamsonlawpolicy.com

*Counsel for Movant-Intervenors*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

GLOSSARY................................................................................................v

BACKGROUND .........................................................................................3

ARGUMENT ..............................................................................................6

    I.      ALTA AND CUSER MEET THE STANDARD FOR
            INTERVENTION....................................................................6

          A.     The Motion to Intervene is Timely ....................................7

          B.     The Disposition of This Case Could Impair ALTA and
               CUSER's Strong Interest in the TT Reconsideration Rule
               Affecting Cold Storage ....................................................8

          C.     Existing Parties Cannot Adequately Represent ALTA and
               CUSER's Interest in the Cold Storage Rule ....................9

          D.     Exclusion from this Litigation Would Impair Movant-
               Intervenors' Ability to Protect Commercial Interests....................12

    II.     MOVANT-INTERVENORS NEED NOT ESTABLISH ARTICLE
         III STANDING, BUT SATISFY STANDING REQUIREMENTS
         REGARDLESS ...................................................................13

          A.     Rule 24 Intervenors Have Article III Standing.............................13

          B.     Defensive Intervenors Should Not Need to Show Article III
                Standing..........................................................................14

          C.     Movant-Intervenors Have Standing ...............................16

CONCLUSION ..........................................................................................19

CORPORATE DISCLOSURE STATEMENT ....................................................20

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..........21

CERTIFICATE OF COMPLIANCE.................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*AFL-CIO v. Scofield*,
382 U.S. 205 (1965) ................................................................................6

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) .............................................................17

*Amalgamated Transit Union v. Donovan*,
771 F.2d 1551 (D.C. Cir. 1985) ..............................................................6

*Berger v. North Carolina State Conference of the NAACP*,
597 U.S. 179 (2022) ..............................................................................10

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..............................................................................14

*Clinton v. City of New York*,
524 U.S. 417 (1998) ..............................................................................17

*Craig v. Boren*,
429 U.S. 190 (1976) ..............................................................................17

*Crossroads Grassroots Policy Strategies v. FEC*,
788 F.3d 312 (D.C. Cir. 2015) ............................................... 10, 11, 18

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ..............................................................................14

*Deutsche Bank Nat'l. Tr. Co. v. Fed. Deposit Ins. Corp.*,
*717 F.3d 189 (D.C. Cir. 2013)* ........................................................ 14, 17

*Dimond v. Dist. of Columbia*,
792 F.2d 179 (D.C. Cir. 1986) ...............................................................9

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) .............................. 7, 8, 10, 11, 12, 18

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ..............................................................................16

*Hurt v. SSA*,
544 F.3d 308 (D.C. Cir. 2008) ..............................................................16

*Institutional Shareholder Services, Inc. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025)..................................................................15

*King v. Governor of New Jersey*,
767 F.3d 216 (3d Cir. 2014)......................................................................14

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)..................................................................................15

*Maine Lobstermen's Ass'n v. National Marine Fisheries Service*,
70 F.4th 582 (D.C. Cir. 2023)...................................................................15

*Military Toxics Project v. EPA*,
146 F.3d 948 (D.C. Cir. 1998) ...................................................... 8, 17, 18

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)..................................................................................14

*National Lime Ass'n v. EPA*,
233 F.3d 625 (D.C. Cir. 2000) ..................................................................18

*NRDC v. Costle*,
561 F.2d 904 (D.C. Cir. 1977) ..................................................................12

*Roeder v. Islamic Republic of Iran*,
333 F.3d 228 (D.C. Cir. 2003) ........................................................... 13, 18

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) ..................................................................17

*Smoke v. Norton*,
252 F.3d 468 (D.C. Cir. 2001) ....................................................................7

*Sokaogon Chippewa Cmty. v. Babbitt*,
214 F.3d 941 (7th Cir. 2000) .............................................................. 13-14

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
581 U.S. 433 (2017)........................................................................... 14-15

*Trbovich v. United Mine Workers*,
404 U.S. 528 (1972)...............................................................................9, 10

*Virginia House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019)........................................................................... 14, 16

*Williams & Humbert Ltd. v. W & H Trade Marks (Jersey) Ltd.*,
840 F.2d 72  (D.C. Cir. 1988)......................................................................7

**Statutes and Other Authorities:**

42 U.S.C. § 7675 ..................................................................................................3

42 U.S.C. § 7675(i) ..............................................................................................3

40 C.F.R. § 84.54 ................................................................................................1

40 C.F.R. § 84.54(c)(9) .......................................................................... 4, 5, 8, 9

40 C.F.R. part 84, subpart B .................................................................................8

D.C. Cir. R. 15(b) .............................................................................................2, 6

Fed. R. App. P. 15(d) ................................................................................. 6, 7, 19

Fed. R. Civ. P. 24 ................................................................................................6

Fed. R. Civ. P. 24(a) ............................................................................... 13, 18, 19

Fed. R. Civ. P. 24(a)(2) ........................................................................ 6, 12, 13, 14

Fed. R. Civ. P. 24(a)(3) .....................................................................................13

Fed. R. Civ. P. 24(b) ...........................................................................................7

Notes of Advisory Committee – 1966 Amendment,
    Fed. R. Civ. P. 24(a)(2), (a)(3) .....................................................................13

Pub. L. 116-260, div. S, § 103, Dec. 27, 2020, 134 Stat. 2255 ...............................3

U.S. EPA, "*Phasedown of Hydrofluorocarbons: Reconsideration of
    Certain Regulatory Requirements Promulgated Under the Technology
    Transitions Provisions of the American Innovation and Manufacturing
    Act of 2020*," 91 Fed. Reg. 31,284 (May 26, 2026).................................. 1, 5, 8

# GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| CAA | Clean Air Act |
| EPA | United States Environmental Protection Agency |
| GWP | Global Warming Potential |
| HFC | Hydrofluorocarbon |
| JA | Joint Appendix |
| RTC | Response to Comments |
| TT | Technology Transitions |

This consolidated case involves petitions for review of the final rule promulgated by the U.S. Environmental Protection Agency ("EPA") entitled *"Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020,"* 91 Fed. Reg. 31,284 (May 26, 2026) ("TT Reconsideration Rule"), which implements a portion of the American Innovation and Manufacturing Act of 2020 ("AIM Act"). EPA's regulations under the AIM Act at 40 C.F.R. § 84.54 impose restrictions on the use of certain refrigerants for refrigeration equipment used in cold storage warehouses and other large facilities like data centers. The TT Reconsideration Rule readjusted some of the restrictions applicable to cold storage warehouses in particular.

Movant-Intervenor ALTA Refrigeration, Inc. ("ALTA Refrigeration") manufacturers and installs industrial-scale refrigeration systems that are directly regulated by the EPA rule at issue in case No. 26-1168 and anticipates that challenges to the deregulatory aspects of the rule, if successful, will impair its significant interests in manufacturing and installing refrigeration systems at cold storage warehouses, as well as the interests of its customers who own and operate cold storage facilities. Movant-Intervenor the Coalition for the Use of Safe and Efficient Refrigerants ("CUSER") is a Georgia non-profit trade association that includes as its members manufacturers of refrigeration systems like ALTA and

1

owners and operators of cold storage warehouses located throughout the United States which are directly regulated by the challenged EPA rule. This motion is supported by the attached Declaration of Eric Brown, the chief executive of ALTA Refrigeration and chair of CUSER (Ex. A, hereto).

Movant-Intervenors move to intervene in case No. 26-1168 pursuant to D.C. Cir. R. 15(b) in support of the Federal Respondents, U.S. EPA and Administrator Zeldin, and intend to participate in any other consolidated case in which EPA's regulation of cold storage may be implicated.[1] After contacting counsel for all the parties, Movant-Intervenor is authorized to state that Petitioners in No. 26-1168, Heating, Air Conditioning & Refrigeration Distributors Int'l ("HARDI") (26-1168); Plumbing-Heating-Colling Contractors – National Ass'n (26-1168) ("PHCC"); and Air Conditioning Contractors of America Ass'n, Inc. ("ACCA") (26-1168), have indicated that they will reserve their position until they have an opportunity to review the motion to intervene; Petitioners in No. 26-1174, Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") (26-1174) and Alliance for Responsible Atmospheric Policy ("Alliance") (26-1174), have indicated that they do not oppose; and Federal Respondents have indicated that have indicated that they will reserve their position until they have an opportunity to review the motion to intervene.

---

[1] At this point, the only other consolidated petition, No. 26-1174, does not appear to implicate cold storage regulations.

In support of this motion to intervene, Movant-Intervenors state as follows:

**BACKGROUND**

On December 27, 2020, Congress passed and President Trump signed the AIM Act as part of an omnibus budget measure. Pub. L. 116-260, div. S, § 103, Dec. 27, 2020, 134 Stat. 2255, *codified at* 42 U.S.C. § 7675, to promote, as its title suggests, "American Innovation and Manufacturing." Generally, the AIM Act delegates to the U.S. EPA certain authorities to regulate the use of hydrofluorocarbon ("HFC") refrigerants in various subsectors of the refrigeration, heating and cooling industry. *See* 42 U.S.C. § 7675(i). The AIM Act does not expressly mention the cold storage sector.

In 2023, EPA finalized a rule known as the "Technology Transitions Rule" ("TT Rule") which restricted the use of certain HFC refrigerants based on the "global warming potential" ("GWP") of each particular refrigerant.[2] In particular, EPA restricted use of HFCs in refrigeration equipment used in cold storage warehouses, which are large commercial/industrial facilities that store food, pharmaceuticals, and other perishable goods in the stream of commerce between farms, transport, distribution, retail (such as grocery stores) and consumers (such as American

---

[2] Movant-Intervenor is mindful of the Court's admonition against acronyms, but these designations are used frequently in the agency record and their use will facilitate the Court's consideration of the issues.

families) that is broadly referred to as the "cold chain." *See generally* Brown Declaration. EPA's 2023 TT Rule restricted new cold storage warehouses from using HFC refrigerants with a GWP higher than 150 starting January 1, 2026.

In 2025, EPA proposed revisions to the GWP limits for cold storage and three other sectors in its TT Reconsideration Rule. As finalized in May 2026, the TT Reconsideration Rule adjusted the limitations such that cold storage warehouses can use HFC refrigerants up to 700 GWP until January 1, 2032, but afterwards are again restricted to refrigerants less than 150 GWP.[3]

---

[3] As amended by the TT Reconsideration Rule, EPA's regulations at 40 C.F.R. § 84.54(c)(9) read in relevant part: "§ 84.54 Restrictions on the use of hydrofluorocarbons . . . (c) No person may install any system, nor have any such system be installed through their position as a designer, owner, or operator of that system, in the following sectors or subsectors that uses a regulated substance as listed in this paragraph (c): . . . (9)(i) Effective July 27, 2026, cold storage warehouse systems using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 700 or greater; and (ii) Effective January 1, 2032, cold storage warehouse systems using a regulated substance, or a blend containing a regulated substance, as follows: (A) Systems with a refrigerant charge capacity of 200 pounds or greater , that are not the high temperature side of a cascade system, using a regulated substance, or a blend containing a regulated substance, with a global warming potential of 150 or greater;"). The TT Rule also regulates smaller cold storage systems and cascade systems but Intervenor-Movants are not concerned with those restrictions.

EPA published its revised TT Reconsideration Rule in the Federal Register on May 26, 2026.[4] Petitioners in case No. 26-1168 ("HARDI Petitioners") are distributors of refrigeration units, parts and supplies that are used in building certain refrigeration and air conditioning equipment. HARDI Petitioners challenged the TT Reconsideration Rule in this Court, objecting to EPA's adjustment of HFC restrictions for certain subsectors, including the higher limits for cold storage applicable between 2026 and 2032. *See* HARDI Pet. for Review, filed June 24, 2026 ("Petitioners seek review of only the portions of the Final Rule amending 40 C.F.R. § 84.54(c)(9), addressing cold storage warehouse systems; 40 C.F.R. § 84.54(c)(11), addressing remote condensing units in retail food refrigeration systems; and 40 C.F.R. § 84.54(c)(12), addressing supermarket systems. Petitioners seek review on the ground that these portions of the Final Rule are arbitrary and capricious, contrary to the American Innovation and Manufacturing Act of 2020, and otherwise not in accordance with law."). HARDI Petitioners did not challenge other aspects of the TT Reconsideration Rule that were favorable to their interests.

---

[4] U.S. EPA, "*Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020*," 91 Fed. Reg. 31,284 (May 26, 2026).

**ARGUMENT**

Movant-Intervenors ALTA Refrigeration and CUSER seek to intervene in this case because they have a direct and substantial interest in this litigation that cannot be adequately represented by any other party, including the government. Movant-Intervenors satisfy both the Court's standard for intervention in petition-for-review proceedings and the standing requirements for intervention (to the extent standing is required). Accordingly, the Court should grant the Motion for Leave to Intervene in this case.

## I. ALTA AND CUSER MEET THE STANDARD FOR INTERVENTION

Federal Rule of Appellate Procedure 15(d) and Circuit Rule 15(b) establish procedural requirements for intervention that the motion "must contain a concise statement of the interest of the moving party and the grounds for intervention." This motion satisfies those procedural requirements. This motion is timely and is being served on all parties to the case.

Rule 15(d) does not delineate standards for intervention. Courts therefore often look to the policies embodied in Rule 24 of the Federal Rules of Civil Procedure to inform their intervention inquiry. *See, e.g.*, *AFL-CIO v. Scofield*, 382 U.S. 205, 216-17 n.10 (1965); *Amalgamated Transit Union v. Donovan*, 771 F.2d 1551, 1553 n.3 (D.C. Cir. 1985). Pursuant to Fed. R. Civ. P. 24(a)(2), intervention must be granted when the following requirements are met: (1) the application is

timely; (2) the applicant has an interest relating to the subject of the action; (3) disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest would not be represented adequately by the existing parties to the suit. *See, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *Smoke v. Norton*, 252 F.3d 468, 470 (D.C. Cir. 2001) (citing *Williams & Humbert Ltd. v. W & H Trade Marks (Jersey) Ltd.*, 840 F.2d 72 ,74 (D.C. Cir. 1988)). Even where the claim does not support mandatory intervention, the Court may nevertheless grant the request if the intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Each Movant-Intervenor satisfies each of those requirements.

## A.     The Motion to Intervene is Timely

The Court has established a deadline of July 27, 2026, for procedural motions in case No. 26-1168. Clerk's Order (ECF #2180476), dated June 25, 2026. This motion is filed by that deadline and thus is timely. This motion is also timely under Fed. R. App. P. 15(d) because it was filed within 30 days of the HARDI petition for review. HARDI Pet. for Review (ECF #2180473), filed June 24, 2026. Further, this proceeding is still at its earliest stages, and allowing Movant-Intervenors to participate would not cause any disruption to the progress of the proceeding.

7

**B.** **The Disposition of This Case Could Impair ALTA and CUSER's Strong Interest in the TT Reconsideration Rule Affecting Cold Storage**

An intervenor must demonstrate an interest relating to the outcome of the proceeding that may be otherwise impaired or impeded by the litigation. In a challenge to a government action, an intervenor may satisfy this requirement by demonstrating that an order overturning that action would strip a benefit conferred upon the entity, thus causing a concrete injury. *Fund for Animals*, 322 F.3d at 733; *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998).

The TT Reconsideration Rule directly regulates refrigeration "systems," which ALTA manufactures and installs in cold storage warehouses throughout the United States. 40 C.F.R. § 84.54(c)(9); Brown Decl. ¶¶ 7, 22. In addition, ALTA is a member of CUSER, whose members own and operate cold storage warehouses at which refrigeration systems regulated by the TT Reconsideration Rule are installed. 91 Fed. Reg. at 31,287 ("You may be potentially affected by this rule if you manufacture, import, export, sell, distribute, install, or use . . . cold storage warehouses"); Brown Decl. ¶¶ 14-15. Moreover, CUSER filed the administrative petition under the AIM Act which precipitated, in part, the TT Reconsideration Rule. 91 Fed. Reg. at 31,289 ("The EPA also received other requests to adjust certain restrictions at 40 CFR part 84, subpart B for . . . cold storage warehouses [fn. 27 See request from trade association dated March 6, 2025, in the docket for this action.]").

8

ALTA and CUSER's interests are jeopardized by the HARDI petitioners' argument that the revised cold storage rules are "arbitrary and capricious" and should be vacated. HARDI Pet. for Review (ECF #2180473), filed June 24, 2026.

The threat to Movant-Intervenors' interests is obvious – by its express terms the TT Reconsideration Rule regulates the installation of the type of large refrigeration systems that are installed at cold storage warehouses. 40 C.F.R. § 84.54(c)(9); Brown Decl. ¶ 22. As of January 1, 2026, EPA's rules under the original 2023 TT Rule restricted the GWP of HFC refrigerants used in cold storage to 150 GWP. The TT Reconsideration Rule raised the GWP from 150 to 700 for HFC refrigerants at least through the year 2032. Even with the adjustment to the GWP limits, companies in the cold storage sector are subject to EPA's restrictions and limit the type of refrigerants that can be used and the type of equipment that can be installed in cold storage warehouses.

### C. Existing Parties Cannot Adequately Represent ALTA and CUSER's Interest in the Cold Storage Rule

In addressing the inadequacy of representation from existing parties, the movant "need only show that representation of [its] interests 'may be' inadequate, not that representation will in fact be inadequate." *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *see also Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). The D.C. Circuit applies this standard broadly. *See Dimond*, 792 F.2d at 192. This Court has further recognized that movants' burden is not

onerous by "often conclud[ing] that governmental entities do not adequately represent the interests of aspiring intervenors." *See Fund for Animals,* 322 F.3d 728, 736. The adequate-representation "requirement . . . is satisfied if the [movant] shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *see also Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179, 195 (2022) (requirement "present[s] proposed intervenors with only a minimal challenge"). Thus, this requirement is unmet only if "it is clear that the party will provide adequate representation." *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015).

Here, no party will adequately represent ALTA and CUSER's interests of seeing that EPA's AIM Act regulations do not overly restrict the use of refrigerants in the cold storage subsector. The HARDI Petitioners are actively seeking to restrict the type of refrigerants used by ALTA in its manufacturing of large refrigeration equipment and its installation of that equipment in cold storage warehouses by restricting the GWP limit to a low level. The relief sought by the HARDI Petitioners would also restrict what equipment and refrigerants can be installed in the cold storage warehouses that other CUSER members own and operate.

It is also far from clear that Federal Respondents, whom Movant-Intervenors would support with respect to HARDI Petitioners' challenge in case No. 26-1168,

will adequately represent the interests of ALTA as a cold storage refrigeration manufacturer and installer, and CUSER members who are cold storage warehouse owners. This Court "look[s] skeptically on government entities serving as adequate advocates for private parties." *Crossroads*, 788 F.3d at 321. That skepticism is warranted here because EPA, as a governmental agency, is "charged by law with representing the public interest," whereas Movant-Intervenors "seek to protect a more narrow and parochial financial interest." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003). This difference means that Federal Respondents would not clearly provide adequate representation even if they and Movant-Intervenors "undisputedly agreed that the agenc[ies'] [actions] were lawful." *Crossroads*, 788 F.3d at 321.

In this case, the interests of Movant-Intervenors and Federal Respondents diverge considerably with respect to GWP limits on cold storage warehouses. In the initial 2023 TT Rule, EPA under the Biden Administration imposed a much lower, unworkable GWP limit on cold storage warehouses, which impelled Movant-Intervenors to petition the Trump Administration in 2025 to revise the limits. Respondents did address Movant-Intervenors' concerns, in part, in the 2026 TT Reconsideration Rule by raising the GWP limit for cold storage to 700, but EPA did so only temporarily, in contravention of Movant-Intervenors' request for a permanent readjustment. The newly revised cold storage rules contain a sunset

provision reverting back to the previous 150-GWP limit in 2032, which from Movant-Intervenors' perspective is an unworkable restriction. Movant-Intervenors may themselves challenge that EPA action in a subsequent petition for review in this Court, which would likely be consolidated with case No. 26-1168. Thus Federal Respondents would be in a decidedly mixed posture with respect to Movant-Intervenors, being on the same side of the "v" in one case and opposite sides in another related case challenging the same agency action.

As another factor, precisely because its interests in this case are "more narrow and focused" than EPA's, Movant-Intervenors are in a position to present different arguments, or present arguments in a substantially different manner than EPA, thus offering a unique perspective that is "likely to serve as a vigorous and helpful supplement to EPA's defense." *NRDC v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977); *see also Fund for Animals*, 322 F.3d at 736-37 (noting private parties and government agencies may agree about the lawfulness of the agency's action, yet offer different perspectives and divergent interests); *NRDC*, 561 F.2d at 913 (same).

D.  **Exclusion from this Litigation Would Impair Movant-Intervenors' Ability to Protect Commercial Interests**

The analysis of the impact the disposition of the action would have on Movant-Intervenors' interests under Fed. R. Civ. P. 24(a)(2) involves both practical and legal considerations: "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule,

12

be entitled to intervene." Notes of Advisory Committee – 1966 Amendment, Fed. R. Civ. P. 24(a)(2), (a)(3).

Here, as discussed above, a determination that cold storage warehouses are restricted in the types of refrigerants they can use would require ALTA to re-engineer its refrigeration systems to accommodate refrigerants that are less efficient, less safe, and more environmentally harmful than the HFC refrigerant that ALTA currently uses. Owners of cold storage warehouses represented by CUSER would similarly be restricted in what refrigeration systems they can install, or have installed, in the cold storage warehouses that the own and operate.

If Movant-Intervenors are excluded from defending at least the higher regulatory limit on GWP that the TT Reconsideration Rule provided temporarily until 2032 (i.e., 700 GWP), they will again be subject to the lower 150-GWP limit, which would be unworkable and dangerous for cold storage warehouses.

## II. MOVANT-INTERVENORS NEED NOT ESTABLISH ARTICLE III STANDING, BUT SATISFY STANDING REQUIREMENTS REGARDLESS

### A. Rule 24 Intervenors Have Article III Standing

To the extent standing is required for intervention, Movant-Intervenors each satisfy Article III standing requirements. This Court has stated that "any person who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) (*citing Sokaogon*

*Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 946 (7th Cir. 2000)). As set forth above, Movant-Intervenors meet the elements of the intervention of right test under Fed. R. Civ. P. 24(a)(2) and therefore each has standing to intervene in this action.

**B.      Defensive Intervenors Should Not Need to Show Article III Standing**

This Court has previously commented that a proposed intervenor supporting a respondent or defendant must also establish its Article III standing. *See Deutsche Bank Nat'l. Tr. Co. v. Fed. Deposit Ins. Corp.*, 717 F.3d 189, 193 (D.C. Cir. 2013). However, any such requirement is contrary to Supreme Court precedent, as other circuits have recognized. *See, e.g., King v. Governor of New Jersey*, 767 F.3d 216, 245-46 (3d Cir. 2014), *abrogated in part on other grounds by National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018). The Supreme Court has held that it is "not . . . incumbent" on intervenors supporting "[d]efendants" or "appellee[s]" "to demonstrate [their] standing" "[b]ecause neither role entail[s] invoking a court's jurisdiction." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). Indeed, the notion of a defensive party's "standing" is incoherent because such a party necessarily does not claim to have been injured by the action being defended and does not ask the court to grant it any relief regarding that action. It makes no more sense to ask whether a defensive intervenor has "standing" than to ask whether a defendant or respondent has standing. *See also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006); *Clapper v. Amnesty*

*Int'l USA*, 568 U.S. 398, 410-11 (2013); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439-40 (2017). Even if defensive standing were required, the respondent or defendant would certainly have it, obviating the need for a defensive intervenor to establish its own standing because an intervenor need show its standing only if it "pursues relief that is broader than or different from" the relief pursued by an existing party, and a defensive intervenor can seek only the relief that the defendant or respondent seeks: the rejection of the plaintiff's or petitioner's claim and the vindication of the defendant's action (though, again, that is not "relief" in a jurisdictional sense at all). *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020); *accord Maine Lobstermen's Ass'n v. National Marine Fisheries Service*, 70 F.4th 582, 593 (D.C. Cir. 2023) ("Because the Association has standing to sue . . . we do not need to consider the standing of the intervenors."). That is certainly true here because Movant-Intervenors merely seek affirmance of the aspect of the TT Reconsideration Rule's limits on cold storage warehouses which is challenged by HARDI Petitioners, just as EPA does. *Cf. Institutional Shareholder Services, Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (observing that that Circuit requirement that intervenors show standing "is in tension with" Supreme Court decisions holding that "intervenors that seek the same

relief sought by at least one existing party need not do so").[5] Because these "intervening Supreme Court cases . . . overruled" this Court's precedent requiring defensive intervenors to show standing, this Court can and should jettison its precedent, with or without the *Irons* procedure. *Hurt v. SSA*, 544 F.3d 308, 310 n.1 (D.C. Cir. 2008); *see* D.C. Cir., Policy Statement on En Banc Endorsement of Panel Decisions at 1 (Jan. 17, 1996).

### C.    Movant-Intervenors Have Standing

In any event, Movant-Intervenors satisfy this Court's standing requirement for defensive intervenors.

With respect to ALTA, it is a directly regulated entity whose standing is obvious. ALTA will be injured if the GWP limit for refrigerants is lowered from 700 to 150, as HARDI Petitioners seek with their challenge to the TT Reconsideration Rule. The agency action at issue (i.e., EPA's rulemaking) is the direct cause of the restrictions on ALTA's ability to legally use certain refrigerants for cold storage refrigeration systems. And an order from this Court rejecting the HARDI Petitioner's

---

[5] A defensive intervenor might need to establish Article III standing to *appeal* a judgment if the defendant or respondent declines to appeal the same portion of the judgment below, but that standing can and should be assessed only at the time of the appeal and assessed only relative to the *judgment*, which would be the relevant injurious act. *See, e.g.*, *Virginia House*, 587 U.S. at 663 (defensive intervenor did not need to establish standing in district court but did need to as appellant); *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).

challenge would redress any injury to ALTA from the previously-lower GWP limits imposed by EPA. The challenged EPA rule would impose restrictions on HFC-based refrigeration systems that are not placed on other refrigeration manufacturers. *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) ("The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement."); *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279-80 (D.C. Cir. 2023). In addition, limiting the use of HFC refrigerants for cold storage would "constrict[]" ALTA's and other CUSER members' "market," causing "a direct economic injury" cognizable under Article III. *Craig v. Boren*, 429 U.S. 190, 194 (1976).

With respect to CUSER, an association has Article III standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Military Toxics Project v. EPA*, 146 F.3d 948, 953-54 (D.C. Cir. 1998). And to have standing in its own right, an association member must show "injury-in-fact, causation, and redressability" which ALTA does here. *Deutsche Bank*, 717 F.3d at 193.[6] ALTA and other CUSER members plainly have standing to

---

[6] Only one association member needs to have standing. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002); *Military Toxics Project*, 146 F.3d at 954.

intervene because they "benefit[] from" the TT Reconsideration Rule raising the GWP limit for HFC refrigerants used in cold storage refrigeration systems; the standards are "challenged in court," and "an unfavorable decision would remove [that] benefit." *Crossroads*, 788 F.3d at 317; *Fund for Animals*, 322 F.3d at 733-34; *Military Toxics*, 146 F.3d at 954. That is all that is needed to establish standing injury. Nonetheless, ALTA and CUSER members standing is also evident for the same reasons that ALTA and CUSER members have a sufficient interest at stake to intervene under Rule 24(a). *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("any person who satisfies Rule 24(a) will also meet Article III's standing requirement").

Finally, the other two requirements for associational standing are also satisfied. As evident from its name, the purpose of CUSER is to advocate for its members' ability to use safe and efficient refrigerants, rather than the low-GWP refrigerants that EPA's rules otherwise require. The interests that CUSER seeks to protect in this litigation are germane – indeed integral – to its purpose of protecting and promoting the flexibility to use safe and efficient refrigerants, including HFCs, and "mere pertinence between litigation subject and organizational purpose is sufficient." *National Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000). And the validity of EPA's decisions in the TT Reconsideration Rule can be adjudicated

without the participation of any of CUSER's individual members although ALTA seeks to intervene as well.

## CONCLUSION

For the foregoing reasons, the Court should grant Movant-Intervenors' motion to intervene. Both Movant-Intervenors are entitled to intervene as of right in this proceeding under Fed. R. App. P. 15(d) and the criteria applied under Fed. R. Civ. P. 24(a). Movant-Intervenors therefore respectfully request that this Court grant the Motion for Leave to Intervene pursuant to Fed. R. App. P. 15(d) on behalf of respondents in this proceeding.

Dated: July 16, 2026

Respectfully submitted,

/s/ David M. Williamson

David M. Williamson
WILLIAMSON LAW + POLICY, PLLC
1001 Connecticut Ave. NW, Suite 612
Washington, DC 20036
(202) 256-6155
maxwilliamson@williamsonlawpolicy.com

*Counsel for Movant-Intervenors*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Movant-Intervenor ALTA Refrigeration, Inc. states that it is a Georgia corporation which is not owned in whole or in part by a parent corporation or a publicly traded company and which does not issue stock.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Movant-Intervenor Coalition for the Use of Safe and Efficient Refrigerants states that it is a Georgia not-for-profit corporation which is not owned in whole or in part by a parent corporation or a publicly traded company and which does not issue stock.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 27(a)(4), Movant-Intervenors, through undersigned counsel, hereby certifies the following as to parties, rulings, and related proceedings in this case:

## *Parties, Intervenors, and Amici*

**A.** *Petitioners*

Heating, Air Conditioning & Refrigeration Distributors Int'l ("HARDI") (26-1168); Plumbing-Heating-Cooling Contractors – National Ass'n (26-1168) ("PHCC"); Air Conditioning Contractors of America Ass'n, Inc. ("ACCA") (26-1168); Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") (26-1174); Alliance for Responsible Atmospheric Policy ("Alliance") (26-1174).

**B.** *Respondents*

U.S. Environmental Protection Agency and Lee M. Zeldin, EPA Administrator.

**C.** *Intervenors for Petitioners*

None.

**D.** **Intervenors for Respondents**

ALTA Refrigeration, Inc. ("ALTA Refrigeration") and Coalition for the Use of Safe and Efficient Refrigerants ("CUSER") (Intervenor-Movant).

**E.** *Amicus Curiae*

None

United States Environmental Protection Agency's final rule entitled "Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020," 91 Fed. Reg. 31,284 (May 26, 2026) ("TT Reconsideration Rule"), implementing the American Innovation and Manufacturing Act of 2020 ("AIM Act").

## *Related Cases*

None.

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of this Court's December 18, 2023 order because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e), this motion contains 4,366 words. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

July 16, 2026

/s/ Christina Karem
Christina Karem

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served via the Court's Electronic

Case Filing system upon all registered counsel as of the date indicated below.


Dated: July 16, 2026

/s/ Christina Karem
Christina Karem

# EXHIBIT A

# Brown Declaration

<u>**DECLARATION OF ERIC BROWN, ALTA REFRIGERATION**</u>

I, Eric Brown, hereby declare the following under penalty of perjury:

1. This affidavit is submitted to support intervention of ALTA Refrigeration, Inc. ("ALTA") and the Coalition for the Use of Safe and Efficient Refrigerants ("CUSER") in litigation in case No. 26-1168 pending in the U.S. Court of Appeals for the District of Columbia Circuit challenging the U.S. EPA's regulations under the AIM Act at 40 C.F.R. § 84.54(c)(9), which impose restrictions on the use of certain refrigerants for refrigeration equipment used in cold storage warehouses.

2. I am over the age of eighteen, and competent to testify about the following facts based on my personal knowledge.

3. I am the President of ALTA Refrigeration, based in Peachtree City, Georgia.

4. I am also chair of the CUSER trade association.

5. ALTA manufacturers and installs industrial-scale refrigeration systems that are directly regulated by the EPA rule at issue in case No. 26-1168. ALTA anticipates that challenges to the deregulatory aspects of the rule, if successful, will impair its significant interests in manufacturing and installing refrigeration systems for cold storage warehouses, as well as the interests of its customers who own and operate cold storage facilities.

6. The Coalition for the Use of Safe and Efficient Refrigerants ("CUSER") is a Georgia non-profit trade association that includes as its members manufacturers of refrigeration systems like ALTA and owners and operators of cold storage warehouses located throughout the United States which are directly regulated by the challenged EPA rule. ALTA is a founding member of CUSER.

<u>**About ALTA Refrigeration**</u>

7. ALTA is a designer, builder and installer of refrigeration systems for industrial cold

storage warehouse facilities using ALTA's proprietary market leading "EXPERT System" refrigeration system across America.

8. ALTA was originally founded in 1975 and has been designing and installing industrial refrigeration systems for 50 years.

9. ALTA's two owners both hold BSME engineering degrees from Purdue University and have over 50 years of experience between them. In addition, ALTA has a team of engineers and support staff with decades of collective experience.

10. Cold storage facilities are a core element of the refrigerated "cold chain" that provides fresh, affordable food to 340 million Americans in this country and our markets abroad. Cold storage facilities support the food, pharmaceutical, health care, cosmetics, biotechnology, chemical, retail, agriculture, and other sectors. According to the Cybersecurity and Infrastructure Security Agency, cold storage supports the Food and Agriculture and Critical Manufacturing sectors, which are considered critical infrastructure for national security.

11. Cold storage warehouses must reliably maintain temperatures from -20°F to 55°F for refrigerated and frozen storage. In order to achieve these temperatures, cold storage refrigeration systems typically use thousands of pounds of refrigerant charge per system with multiple systems serving a facility.

12. Prior to EPA's relatively recent regulation of hydrofluorocarbons refrigerants ("HFCs"), cold storage facilities had used fluorocarbon refrigerants known as chlorofluorocarbons ("CFCs"), hydrochlorofluorocarbons ("HCFCs") and older versions of HFCs, all of which have relatively high global warming potential ("GWP"). Before the availability of safer fluorocarbons, cold storage facilities typically used ammonia systems (GWP 0) and many cold storage warehouses up to this point have used ammonia, but the industry – led by ALTA and its customers

2

– has been moving away from ammonia due to its inherent hazards, which includes potentially fatal toxicity, flammability, and a troubling history of industrial accidents.

13. Because of these inherent hazards, ALTA transitioned to a safe, non-toxic A1-rated refrigerant. As the perceived climate impacts of higher-GWP refrigerants gained more public attention, ALTA responded to its customer base and began searching for lower-GWP refrigerants about ten years ago. After extensive research and design work looking at all available refrigerants available for industrial cooling applications, ALTA identified R-513A (GWP 630) as the basis for its current EXPERT refrigeration system design, which is the lowest-GWP, non-flammable refrigerant available on the market. There are simply no other viable lower-GWP substitutes currently available in the market that have an A1 (non-toxic/non-flammable) rating, as contrasted with ammonia and most other HFO refrigerants which are toxic and/or flammable (which creates safety and building code issues). Other refrigerants such as $CO_2$ substantially increases greenhouse gas emissions and other air pollution on a lifecycle basis due to their higher operating pressures which increases electricity usage and significantly reduces longevity of equipment. The ALTA EXPERT Systems also save an enormous amount of water when compared to "natural systems" and other technologies that use evaporative cooling.

**About CUSER**

14. The Coalition for the Use of Safe and Efficient Refrigerants ("CUSER") is a Georgia non-profit trade association that includes as its members manufacturers of refrigeration systems and owners and operators of cold storage warehouses located throughout the United States which are directly regulated by the challenged EPA rule.

15. CUSER represents over 50 companies in the industrial cold storage sector. CUSER members design, install, and ultimately use these industrial refrigeration systems and have hundreds of years of combined experience. CUSER members are the lifeblood of the "cold chain"

in the United States and are dedicated to safety, efficiency, and affordability in the industrial cold storage sector.

16. In early 2025, CUSER petitioned EPA under subsection (i) of the AIM Act to adjust its Technology Transition Rule or "TT Rule" at 40 C.F.R. § 84.54(c)(9), which imposed unworkable GWP limits for refrigerants when applied to large cold storage warehouses. *See* CUSER, *AIM Act Petition to Restrict HFC Substitutes Greater than 700 GWP for Cold Storage Warehouses*, dated March 6, 2025 ("The Coalition requests that EPA impose a limit of 700 GWP for refrigerants used in the cold storage warehouse sector under Part 84.54(c)(9), rather than the current caps of 150 GWP and 300 GWP slated to take effect starting with calendar year 2026.").

17. Responding to the CUSER petition in the summer of 2025, EPA Administrator Zeldin and Vice President Vance visited ALTA's manufacturing facility in Peachtree City, Georgia to announce that EPA would be granting CUSER's petition.

18. CUSER's petition eventually led to EPA (partially) revising the TT Rule regulating cold storage warehouses by raising the GWP limit from 150 GWP to 700 GWP, but only until 2032, in the TT Reconsideration Rule now at issue in case No. 26-1168.

**Interests of Intervenors**

19. Cold storage warehouses are a core element of the "cold chain" that provides fresh, affordable food to 340 million Americans in this country and our markets abroad. Cold storage facilities support the food, pharmaceutical, health care, cosmetics, biotechnology, chemical, retail, agriculture, and other sectors. Cold storage must be capable of reliably maintaining a wide range of very cold to cool temperatures from -20°F to 55°F for refrigerated and frozen storage. The cold storage sector is critical to an affordable food supply and any unwarranted costs imposed on our sector will be felt downstream by retailers and consumers. At a time when American families are struggling with persistent inflation, the government should be especially concerned about the

effects of its regulations on kitchen table economics. Our national food supply, including the cold storage system at the heart of the food chain, is also a critical national security concern.

20.     Some of our members have been designing and installing industrial refrigeration systems for more than 45 years and have among them hundreds of years of experience in the cold storage and other refrigeration sectors. Much of that experience was previously devoted to ammonia refrigeration systems. However, due to ongoing concerns about the toxicity and flammability of ammonia (a so-called "natural refrigerant"), CUSER members have been steadily transitioning away from ammonia systems to highly efficient, safer HFC-based systems. Newer HFC-based systems such as ALTA's EXPERT System use nontoxic/non-flammable refrigerants that enable safer cooling systems. This technology also delivers the added benefits of requiring no water and consuming less power than comparable ammonia systems. As highly engineered, custom designs, HFC-based cold storage systems also have very low leak rates, unlike other sectors regulated under the Technology Transition Rule.

21.     Movant-Intervenors are directly regulated by EPA's restrictions on the GWP of refrigerants used by cold storage warehouses as set forth in 40 C.F.R. § 84.54(c)(9).

22.     In the TT Reconsideration Rule at issue in No. 26-1168, EPA adjusted the regulation of cold storage warehouses, which in part increased the available refrigerant options that CUSER members can use for their business. 91 Fed. Reg. 31,284, 31295 (May 26, 2026) ("The EPA is finalizing amendments to the limits for cold storage warehouses to establish a graduated schedule with an interim limit of 700 upon the effective date of this rule, and 150 or 300, depending on charge size or whether it is part of the high temperature side of a cascade system, starting January 1, 2032.").

23.     Petitioners in No. 26-1168 have indicated that they intend to challenge EPA's adjustment of the GWP limits for refrigerants in cold storage systems. *See* HARDI Pet. for Review,

filed June 24, 2026 at 3 (ECF #2180473) ("Petitioners seek review of only the portions of the Final Rule amending 40 C.F.R. § 84.54(c)(9), addressing cold storage warehouse systems . . . on the ground that these portions of the Final Rule are arbitrary and capricious, contrary to the American Innovation and Manufacturing Act of 2020, and otherwise not in accordance with law.").

24.     Movant-Intervenors spent considerable resources petitioning EPA under the AIM Act to revise these rules and have a strong interest in defending EPA's adjustment of the GWP limits from 150 to 700 until 2032.

25.     However, EPA has shown that it cannot adequately defend Movant-Intervenors' interests. Despite the AIM Act requirement that EPA rule on petitions promptly, EPA has not actually ruled on CUSER's petition despite the 6-month statutory deadline in the AIM Act, but rather included a watered-down version of CUSER's request in the TT Reconsideration Rule. *See* U.S. EPA, *Status of Petitions Filed Under Subsection (i) of the AIM Act*, https://www.epa.gov/hfcs/petition-status-technology-transitions (showing CUSER petition received as of March 6, 2025 but showing status as "N/A"); 42 U.S.C. § 7675(i)(3) ("Petitions (A) In general. A person may petition the Administrator to promulgate a rule under paragraph (1) for the restriction on use of a regulated substance in a sector or subsector . . . (B) Response. The Administrator shall grant or deny a petition under subparagraph (A) not later than 180 days after the date of receipt of the petition.").

26.     In the TT Reconsideration Rule notice-and-comment period, EPA rejected CUSER's request for a permanent adjustment of the cold storage limits. In its response to comments, EPA rejected and/or ignored CUSER's experience-based data and instead took the position that "EPA notes that there are currently available substitutes for the cold storage warehouse subsector that comply with the limits of 150 or 300, as applicable, and the EPA expects that these substitutes and others will be available by 2032." *See* Response to Comments at 32; 214-

229. Instead of true regulatory reform, EPA included an unwarranted sunset date of 2032 for the adjusted cold storage limits in the TT Reconsideration Rule, which adversely affects Movant-Intervenors by forcing them back down to the 150-GWP limit in five years. EPA's rejection of CUSER's requests was inconsistent with Administrator Zeldin's public statements in Peachtree City.

27.     Given this history, Movant-Intervenors have significant concerns that EPA will not adequately defend the TT Reconsideration Rule.

Executed this day, July 16, 2026, in Peachtree City, GA.

_____
Eric Brown